THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MURRAY BLUE, Defendant-Appellant.

First District (5th Division)   No. 1—01—0449

Opinion filed September 30, 2003.—Rehearing denied October 31, 2003.

Michael J. Pelletier and Michael C. Bennett, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

A jury convicted defendant, Murray Blue, of the first degree murder of Officer Daniel Doffyn, the attempted first degree murder of Officer Milan Bubalo, Victor Young, and Lawrence Walker, the aggravated battery with a firearm of Officer Bubalo and Victor Young, and two counts of possession of a controlled substance with intent to deliver, and sentenced him to death. On direct appeal, the supreme court reversed and remanded for a new trial. See *People v. Blue*, 189 Ill. 2d 99 (2000).

On remand, the jury again convicted defendant of the first degree murder of Officer Doffyn, the attempted first degree murder of Officer Bubalo and Victor Young, the aggravated battery with a firearm of Officer Bubalo and Victor Young, and two counts of possession of a controlled substance with intent to deliver. Defendant was sentenced to natural life imprisonment for the murder of Officer Doffyn; an 80-year concurrent term of imprisonment for the attempted murder of Officer Bubalo; a 30-year term of imprisonment for the attempted murder of Victor Young, consecutive to the natural life and 80-year sentences; and concurrent sentences of 15 years' and 7 years' imprisonment on the two convictions for possession of a controlled substance with intent to deliver. On appeal, defendant argues: (1) the trial court erred by refusing to instruct the jury on self-defense and second degree murder based upon an unreasonable belief in self-defense; (2) the trial court erred in the giving of certain jury instructions relating to felony murder; (3) the trial court erred in admitting evidence unrelated to the charged offenses; (4) the State failed to prove him guilty beyond a reasonable doubt of possession of a controlled substance with intent to deliver; (5) the trial court erred in sentencing him to 80 years' imprisonment for the attempted murder of Officer Bubalo; and (6) the trial court erred by imposing consecutive sentences in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm defendant's convictions for murder, attempted murder, and aggravated battery with a firearm; we reverse defendant's convictions for possession of a controlled substance with intent to deliver; and we reduce defendant's sentence for the attempted murder of Officer Bubalo from 80 years' imprisonment to 60 years' imprisonment.

At trial, Victor Young testified that he had known defendant all his life and that in 1990 and 1991 he sold heroin and cocaine for defendant at the corner of Maypole and Kildare Streets in Chicago. By 1995, Young was selling heroin and cocaine for one of defendant's competitors, Willie Love, two blocks away at Karlov and Maypole Streets.

Young testified that at approximately 3 p.m. on March 8, 1995, he was walking on Maypole Street with Lawrence Walker and Jermaine Lloyd when they saw Young's nephew, Terrance Thomas, and stopped to speak with him. After speaking with Thomas, Young continued to walk with Walker and Lloyd down Maypole Street. As they walked, defendant leaned out the first-floor window of a building on 4245 West Maypole Street and said to Young, "I heard you been talking to [the police] about me [and] if I hear you been talking to them *** about me again I'm going to f— you up."

Young testified that he turned away from defendant. Young then heard defendant call his name again. Young turned around and saw defendant holding a gun out the window. Young started to run away from the apartment building. Defendant fired several shots at Young and hit him in the left buttock.

Young testified that he fell to the ground and then looked over his shoulder and saw defendant and two other drug dealers, Clyde Cowley and Jimmie Parker, standing in front of the building. Defendant fired several more shots, none of which hit Young. Defendant then said, "Big down. Kill that bitch." Parker ran in front of defendant and fired a shotgun at Young, but the blast missed him. Defendant then said, "it's too hot, man. Let's get out of here." Defendant, Parker, and Cowley ran through a vacant lot and drove away.

Geneva Walker testified that at approximately 3:20 p.m. on March 8, 1995, she was inside her apartment at 754 North Lorel Avenue when she heard the sound of glass breaking outside her apartment. Ms. Walker looked out her window and saw a man perched on the window ledge of the first-floor apartment near the 750 North Lorel Avenue entrance to the building. Ms. Walker saw the man drop broken glass to the ground. Fearful that he was attempting to break in, Ms. Walker called 911.

Officer Elois Harrington testified that at approximately 3:20 p.m. on March 8, 1995, she heard on her police radio that there was a burglary in progress at 750 North Lorel Avenue. Officer Harrington went to the scene, where she saw Officers Milan Bubalo and Daniel Doffyn walking to the front of the building. Officer Harrington drew her gun and went to a gangway at the south of the building. As she reached the end of the gangway, Officer Harrington saw defendant

and Jimmy Parker. Defendant was holding a TEC-9 gun. Officer Harrington radioed that she had an emergency, pointed her gun at the men, and told them to get on the ground.

Officer Harrington testified that defendant ran away toward the rear of the building and that Parker just stood there, looking at her. Eventually, Parker got on the ground. At that time, Officer Harrington heard numerous shots coming from the rear of the building and she heard Officer Bubalo state over the radio that an officer had been shot. Officer Harrington remained with her gun trained on Parker until other officers arrived.

Officer Bubalo testified that on March 8, 1995, he and Officer Doffyn went to the first-floor apartment at 750 North Lorel Avenue to investigate a possible burglary. Officer Bubalo knocked on the door and then heard the sound of breaking glass and of shuffling feet running away from the door toward the backyard of the building. Officer Bubalo and Officer Doffyn then left the building and ran down the north gangway, which led to the backyard.

Officer Bubalo testified that Officer Doffyn, who was leading the way, rounded a corner and reached the backyard first. When Officer Bubalo rounded the corner into the backyard, he saw Officer Doffyn struggling with Clyde Cowley. Officer Doffyn had Cowley in a "bear hug," and Cowley was trying to break free. Officer Bubalo heard multiple gunshots and saw Officer Doffyn and Cowley fall to ground. As soon as they fell, Officer Bubalo observed the defendant holding a TEC-9 gun. Defendant first fired the gun at Officer Doffyn, then he fired the gun at Officer Bubalo, hitting him in the left hip.

Officer Bubalo testified that as he fell to the ground, he saw defendant running toward him. Defendant again fired his gun at Officer Bubalo. Officer Bubalo returned fire and shot the defendant, who fell face forward onto the ground. Officer Bubalo radioed that an officer had been shot, then he crawled over to the defendant and handcuffed his hands behind his back. Officer Podkowa arrived shortly thereafter.

Officer Podkowa testified that he saw Officer Doffyn bleeding from the head and lying on top of Cowley. Officer Podkowa pulled Cowley out from underneath Officer Doffyn and found a loaded, .38-caliber revolver in Cowley's right pants pocket.

Steven Schulz, an ambulance commander and paramedic for the Chicago fire department, testified that at approximately 3:27 p.m. on March 8, 1995, he received a call to respond to a shooting at 750 North Lorel Avenue. When Schulz arrived at the scene, he saw Officer Doffyn lying on the ground with blood and brain matter next to his head. Schulz placed a cervical collar on Officer Doffyn in order to im-

mobilize his neck and prevent further injury, then he moved Officer Doffyn into the ambulance. Inside the ambulance, Schulz established two IVs and hyperventilated Officer Doffyn with oxygen. Schulz also cut off Officer Doffyn's clothes and discovered that he had an additional bullet wound on the right side of his chest. Officer Doffyn later died.

Detective Richard Maher testified that he searched defendant inside the ambulance and found a 9-millimeter pistol in defendant's right front pants pocket and a box of 9-millimeter bullets in his left pants pocket.

Officer John Naujokas testified that he processed the crime scene at approximately 4:15 p.m. on March 8, 1995, and that he recovered a TEC-9 gun, a Taurus six-shot revolver, and spent cartridges. He also found a black Lincoln automobile a couple of doors south of 750 North Lorel Avenue.

Detective Patrick McCormack testified that he and his partner, Detective John Woodall, arrived on the crime scene after the shooting. They entered the apartment at 750 North Lorel Avenue and saw three clear plastic bags of marijuana on top of a table in the living room. On the bedroom dresser they discovered a brown paper bag filled with cocaine and heroin. Two shotguns were underneath the bed and an open box of bullets was on top of the bed.

Officer Robert Davie testified that he and his partner, Officer James Hogan, were assigned to process the interior of the apartment at 750 North Lorel Avenue. They arrived at approximately 4:45 p.m. and discovered a bullet on the concrete walk leading to the back door entrance to the apartment. On top of a coffee table in the living room, Officer Davie saw three plastic bags containing a crushed green plant which Officer Davie believed to be marijuana. Officer Davie collected various items from the coffee table, including a pickle jar, a glass, and a videotape.

Officer Davie testified that inside the master bedroom, he discovered a paper bag filled with narcotics on top of a chest of drawers. On top of the bed, Officer Davie recovered a box of 9-millimeter bullets and one fired 9-millimeter cartridge case. He also retrieved the two shotguns underneath the bed.

Detective Victor Gutierrez testified that after Officers Davie and Hogan processed the apartment, he recovered $5,385 in cash from the apartment.

Edmund Donoghue, the chief medical examiner of Cook County, performed an autopsy on Officer Doffyn on March 9, 1995. Donoghue found evidence of a gunshot wound to the right side of Officer Doffyn's head, a few inches above his right ear. The bullet wound coursed through the right parietal and frontal lobes of Officer Doffyn's brain.

Donoghue also found a second gunshot wound to the right side of Officer Doffyn's chest area. The wound involved the space between the first and second ribs, the right upper, middle and lower lobes of the lung, and the anterior surface of the liver, and the left thigh.

Donoghue opined that Officer Doffyn died of multiple gunshot wounds. Donoghue testified that either of the bullet wounds could have killed Officer Doffyn.

Richard Chenow, formerly of the firearms section of the Chicago police department, opined that the bullet recovered from Officer Doffyn's thigh was fired from the TEC-9 gun that was recovered from defendant. Chenow was unable to conclusively determine the source of the bullet from Officer Doffyn's head because the bullet was heavily mutilated from striking a hard object. Chenow did state that the bullet recovered from Officer Doffyn's head was of the same caliber and had the same number of lands and grooves and directions of twists consistent with bullets test-fired from defendant's TEC-9 gun.

Chenow opined that the bullet removed from Victor Young came from defendant's TEC-9 gun. Chenow was unable to conclusively determine whether the bullet recovered from Officer Bubalo came from defendant's TEC-9 gun; however, Chenow did state that the bullet contained the same number of lands and grooves and directions of twists consistent with bullets test-fired from defendant's TEC-9 gun.

Defendant presented the testimony of Michael Campbell, who stated that on March 8, 1995, he was at his brother's home at 749 North Long Avenue, one block west of Lorel Avenue. At approximately 3 p.m. he heard gunshots. Campbell looked out the back window and saw three black men in the backyard of the house directly across the alley (750 North Lorel Avenue). One of the men was wearing a red and black flannel top. Campbell then saw the three men jump the back gate and enter the backyard of his brother's building. The man wearing the red and black flannel top was holding a gun in the "TEC-9 Uzi family" and he turned and shot across the alley, back the way he had come. The man in the red and black flannel top ran away southbound on Long Avenue and the other two men jumped in a burgundy car and drove away.

During the State's rebuttal, Detectives Joseph Benigno and Robert Collins and Assistant State's Attorney Thomas Rieck all testified that Campbell never told them about the three unidentified men in the backyard of 750 North Lorel Avenue. Officers Bubalo and Harrington both testified that they never saw those three unidentified men.

Defendant was convicted and sentenced on one count of first degree murder, two counts of attempted first degree murder, two counts of aggravated battery with a firearm, and two counts of posses-

sion of a controlled substance with intent to deliver. Defendant filed this timely appeal.

■ First, defendant argues that the trial court erred by refusing to instruct the jury on self-defense pursuant to section 7—1 of the Criminal Code of 1961 (720 ILCS 5/7—1 (West 2000)). Section 7—1 states:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7—1 (West 2000).

■ Pursuant to section 7—1, an instruction on self-defense must be given where the defendant presents some evidence of each of the following elements: (1) force had been threatened against the defendant; (2) defendant was not the aggressor; (3) the danger of harm to the defendant was imminent; (4) the force threatened to the defendant was unlawful; (5) the defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force used by the defendant was necessary; and (6) all of defendant's beliefs were reasonable. *People v. Huddleston*, 243 Ill. App. 3d 1012, 1018 (1993). We review the trial court's refusal to issue tendered jury instructions under an abuse of discretion standard. *People v. Williams*, 315 Ill. App. 3d 22, 31 (2000).

Defendant argues that the testimony of Lawrence Walker supports the instruction on self-defense. Walker testified that at approximately 3 p.m. on March 8, 1995, he and Victor Young went to Maypole Street to warn Young's nephew, Terrance, that a gang faction called "the Dog Pound" was going to be coming soon to shoot at defendant's "people."

Defendant contends that Walker's testimony was evidence that defendant reasonably feared for his life at the time of his confrontations with Victor Young, Officer Doffyn and Officer Bubalo. Accordingly, defendant contends that the trial court should have given a self-defense instruction.

■ Defendant's argument is unavailing as there was no testimony that defendant was aware of the Dog Pound's threat to him and, thus, there is no evidence that he was in fear for his life at the time of the shootings. Even assuming that defendant was aware of the Dog Pound's threats, he still was not entitled to a self-defense instruction. To lawfully use deadly force against another person, defendant must

reasonably fear that he is in imminent danger of death or great bodily harm from that same person. See 720 ILCS 5/7—1 (West 2000). Defendant presented no evidence and makes no argument on appeal that he feared imminent harm from Victor Young, Officer Doffyn, or Officer Bubalo; rather, he argues that he feared imminent harm from members of the Dog Pound. Defendant's fear of imminent harm from the Dog Pound does not justify the use of force against Victor Young, Officer Doffyn, and Officer Bubalo, none of whom were members of the Dog Pound. Accordingly, the trial court did not abuse its discretion in refusing to give a self-defense instruction.

Defendant next argues that a self-defense instruction should have been given on the basis of Michael Campbell's testimony that he saw three other men in the area of the shootings, one of whom was shooting toward the backyard of 750 North Lorel Avenue. Defendant contends that Campbell's testimony supports the theory that in defending himself from these attackers, defendant fired the shots that killed Officer Doffyn and wounded Officer Bubalo.

■ Defendant is apparently arguing for a self-defense instruction based upon the doctrine of transferred intent. Under the doctrine of transferred intent, defendant can be exonerated if he shoots an assailant in self-defense but injures another; defendant's intent to shoot his assailant in self-defense is transferred to the unintended victim. *People v. Conley*, 306 Ill. App. 3d 1, 7 (1999).

■ Campbell's testimony does not support the giving of a self-defense instruction, as he only testified that he saw three men fleeing from the backyard of 750 North Lorel Avenue and that one of the men turned and fired back the way he had come. Campbell did not testify that he saw defendant in the vicinity of the three men, that the men threatened defendant, that their shots were fired at defendant, or that the defendant fired at the three men and inadvertently hit Officers Doffyn and Bubalo. Thus, the trial court did not abuse its discretion in denying a self-defense instruction based upon the doctrine of transferred intent, as there was absolutely no evidence that defendant hit Officers Doffyn and Bubalo while firing at the three unknown assailants.

■ Next, defendant argues that the trial court erred by refusing to instruct the jury on second degree murder based upon an unreasonable belief in self-defense. A person commits second degree murder when he commits the offense of first degree murder and at the time of the killing he believes the circumstances to be such that they justify the use of deadly force under the principles of self-defense, but his belief is unreasonable. *People v. Edmondson*, 328 Ill. App. 3d 661, 664 (2002).

■ Here, as discussed above, there was no evidence that defendant believed Officer Doffyn posed an imminent threat to him so as to justify the use of deadly force under the principles of self-defense. Since defendant did not believe he was shooting Officer Doffyn in self-defense, the trial court did not abuse its discretion in refusing to instruct the jury on second degree murder. See also *People v. King*, 293 Ill. App. 3d 739, 743 (1997) (holding that the trial court did not abuse its discretion in refusing to instruct the jury on second-degree murder based upon an unreasonable belief in self-defense, where the defendant fired his weapon at someone other than the person who had threatened him).

■ Next, defendant argues that his conviction for murder must be reversed because the court instructed the jury on several alternative methods of committing the murder and one or more of those alternative methods is unsupported by the evidence. The jury returned a general verdict of guilty after receiving instructions on intentional murder, knowing murder, and felony murder based upon the predicate felonies of aggravated battery with a firearm against Victor Young and Officer Bubalo[1]. Defendant contends that the felony murder charges are unsupported by the evidence, as Officer Doffyn's death was not proximately caused by the aggravated battery with a firearm against Victor Young and Officer Bubalo. See *People v. Dekens*, 182 Ill. 2d 247 (1998) (holding that Illinois follows the proximate cause theory of felony murder liability such that liability attaches for any death proximately resulting from the commission of the underlying felony).

■ A general finding of guilty is presumed to be based upon any good count in the indictment to which the proof is applicable. *People v. Cardona*, 158 Ill. 2d 403, 411 (1994). When a jury returns a general verdict of guilty after being instructed on intentional, knowing and felony murder arising out of a single transaction, the presumption exists that the jury found defendant guilty of the intentional murder. *People v. Thompkins*, 121 Ill. 2d 401, 455-56 (1988). See also *People v. Shatner*, 174 Ill. 2d 133, 150-51 (1996) (holding that presumption arises when general verdict is supported by indictment establishing that the fact finder at the guilt phase was instructed on all three bases for murder). Here, the testimony of Officer Bubalo, Officer Harrington, Steven Schulz, Edmund Donoghue, and Richard Chenow regarding

---

[1]In his appellant's brief, defendant argues that the trial court also instructed the jury that they could find him guilty of felony murder based upon the predicate felony of aggravated battery with a firearm against Officer Doffyn. Review of the record indicates that the trial court never gave such an instruction, and the defendant concedes as such in his reply brief.

defendant's shooting of Officer Doffyn was sufficient to support defendant's conviction for intentional murder. Thus, there is no need to address the issue of felony murder.

■ Defendant argues, though, that *People v. Griffin*, 247 Ill. App. 3d 1 (1993), compels a different result. In *Griffin*, this court held that "a general guilty verdict based on an instruction which includes different methods of committing the same offense in the disjunctive is grounds for reversal *** where one alternative is legally defective, *i.e.*, fails to correctly state the law." *Griffin*, 247 Ill. App. 3d at 16.

The trial court here gave Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000), which correctly stated the law regarding felony murder, specifically, that to sustain the charge of first degree murder, the State must prove that defendant performed the acts which caused the death of Officer Doffyn and that when the defendant did so, he was committing the offense of aggravated battery with a firearm. Since the instruction correctly stated the law, the felony murder counts were not legally defective and therefore reversal is not required under *Griffin*.

■ Next, defendant argues that the trial court erred by allowing the State to introduce evidence that a handgun was found in defendant's pocket following the shooting. Defendant waived review by failing to object at trial. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). On the merits, we find no error. A weapon found on a defendant when he is arrested is admissible if it can be connected to the crime. *People v. Jackson*, 299 Ill. App. 3d 323, 326 (1998). A connection is established where there is: (1) sufficient testimony to establish that a weapon was used; (2) substantial evidence the defendant participated in the crime; and (3) testimony that the weapon admitted was similar to the one used during the crime. *Jackson*, 299 Ill. App. 3d at 326. Here, Victor Young testified that defendant shot him in the buttock on March 8, 1995. Officer Jerry Buckley testified that on March 8, 1995, he spoke with Young at the hospital following the shooting, and that Young stated that defendant had shot him with a handgun. The testimony of Young and Officer Buckley established a connection between the weapon found on the defendant and the weapon used in the shooting; accordingly, evidence regarding the weapon was properly admissible.

■ Next, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of possession of cocaine and heroin with intent to deliver. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

■■ To sustain a charge of unlawful possession of a controlled substance, the State must prove that defendant knew of the presence of the substance and that it was in his immediate and exclusive control. *People v. Macias*, 299 Ill. App. 3d 480, 484 (1998). Possession may be established by evidence of either actual or constructive possession. *People v. Adams*, 242 Ill. App. 3d 830, 832 (1993). Constructive possession exists without actual physical dominion over the narcotics but where there is an intent and a capacity to exercise control and dominion over them. *People v. Cunningham*, 309 Ill. App. 3d 824, 828 (1999). Constructive possession may be proved if the defendant controlled the premises where the narcotics were found. *Macias*, 299 Ill. App. 3d at 484. Habitation in or rental of the premises where narcotics are discovered is sufficient evidence of control to constitute constructive possession. *Cunningham*, 309 Ill. App. 3d at 828. Proof of residency in the form of rent receipts, utility bills and clothing in closets is relevant to show that defendant lived on the premises and therefore controlled them. *People v. Lawton*, 253 Ill. App. 3d 144, 147 (1993).

■ Here, defendant was not in actual possession of narcotics, as no narcotics were found on his person or among his belongings. Nor was there evidence that defendant controlled the premises at 750 North Lorel Avenue such that he was in constructive possession of the narcotics found therein. Trial testimony established that Etoya Nelson and her sister, Hope Nelson, leased the apartment at 750 North Lorel Avenue where the narcotics were found. Defendant's mother testified that Etoya Nelson was the mother of two of defendant's children; however, she did not testify that defendant lived at 750 North Lorel Avenue. There was no testimony of any mail addressed to defendant at the 750 North Lorel Avenue residence, no rent receipts, no utility bills, no clothing in closets. Further, there was no evidence defendant had a key to the residence. The evidence was to the contrary; defendant broke into the residence on the day that the drugs were discovered by the police.

The State argues for a finding of constructive possession because defendant's fingerprints were found on a pickle jar inside the apartment. Defendant's fingerprints on the pickle jar established his presence inside the apartment. However, mere presence in the vicinity of narcotics cannot establish constructive possession (*People v. Ray*, 232 Ill. App. 3d 459, 462 (1992)); the State must establish that defendant had the immediate and exclusive control of the narcotics.

The State's evidence shows only that defendant broke into the apartment of a woman with whom he had a relationship, that cocaine and heroin were present inside the apartment, and that when the

police arrived, defendant fled the apartment and later fired at the officers. Said evidence is not sufficient to show that defendant controlled the apartment such that he had constructive possession of the narcotics therein. Accordingly, we *reverse defendant's conviction on two counts of possession of a controlled substance with intent to deliver.*

The State argues that *People v. Adams*, 161 Ill. 2d 333 (1994), compels a different result. In *Adams*, defendant and her associates carried cocaine on board an airplane and hid it in the restroom. A jury convicted defendant of possession of a controlled substance with intent to deliver. *Adams*, 161 Ill. 2d at 340. The appellate court reversed because defendant did not have control of the restroom where the drugs were found. *Adams*, 161 Ill. 2d at 344. The supreme court held that constructive possession may exist even where an individual is no longer in physical control of the drugs, as long as he once had physical control of the drugs with intent to exercise control in his own behalf, and he has not abandoned them and no other person has obtained possession. *Adams*, 161 Ill. 2d at 345. The supreme court held that defendant had physical control of the drugs with intent to exercise control in her own behalf, as she and her associates carried the cocaine aboard the airplane and hid it in the bathroom. Further, no other person obtained control of the drugs prior to their seizure by police, and the drugs were never abandoned. Accordingly, the supreme court held that constructive possession existed. *Adams*, 161 Ill. 2d at 345.

In the present case, there was no evidence that defendant carried the drugs to the apartment at 750 North Lorel Avenue or that the drugs otherwise belonged to him. Thus, unlike *Adams*, the State failed to show that defendant had physical control of the drugs with intent to exercise control on his own behalf. Accordingly, the State failed to prove its case on the two counts of possession of a controlled substance with intent to deliver, and therefore we reverse defendant's convictions on the two counts of possession of a controlled substance with intent to deliver.

■ Next, defendant argues that the trial court erred in admitting testimony regarding the marijuana and shotguns found in the apartment at 750 North Lorel Avenue following defendant's arrest. Defendant waived review by failing to object at trial. *Enoch*, 122 Ill. 2d at 186. On the merits, the State failed to present evidence showing that defendant controlled the apartment at 750 North Lorel Avenue such that he had constructive possession of the contents therein; nor did the State present any other evidence that the marijuana and shotguns belonged to defendant. In the absence of any evidence linking the marijuana and shotguns to defendant and to the charged offenses, said marijuana and shotguns were irrelevant and inadmissible.

However, the error does not require the reversal of defendant's remaining convictions for murder, attempted murder, and aggravated battery with a firearm. The evidence from Victor Young, Officer Bubalo, Officer Harrington, Steven Schulz, Edmund Donoghue, and Richard Chenow regarding defendant's shooting of Young, Officer Doffyn, and Officer Bubalo was so overwhelming that defendant would have been convicted even if the marijuana, cocaine, heroin, and shotgun evidence had not been admitted. See *People v. Daniels*, 331 Ill. App. 3d 380, 390 (2002) (error is harmless where the properly admitted evidence against defendant is overwhelming).

■ Next, defendant argues that the trial court erred in sentencing him to 80 years in prison for the attempted murder of Officer Bubalo, as the 80-year sentence was in excess of the 60-year statutory maximum. Public Act 88/M680 (Pub. Act 88/M680, eff. January 1, 1995) amended section 8—4(c)(1) of the Criminal Code by changing the sentencing range for the attempted first degree murder of a peace officer from 15 to 60 years to 20 to 80 years. However, prior to defendant's sentencing, our supreme court declared Public Act 88—680 unconstitutional for violating the single subject rule of the Illinois Constitution. See *People v. Cervantes*, 189 Ill. 2d 80 (1999). Therefore, the permissible sentencing range for defendant's conviction for the attempted murder of Officer Bubalo was 15 to 60 years.

Defendant failed to object at trial. However, a sentence that does not conform to a statutory requirement is void and may be corrected at any time. *People v. Arna*, 168 Ill. 2d 107, 113 (1995). Since the trial judge obviously intended to sentence defendant to the maximum allowable sentence for attempt, we reduce defendant's sentence for the attempted murder of Officer Bubalo to the statutory maximum of 60 years. See, *e.g.*, *People v. Boatman*, 312 Ill. App. 3d 340, 345 (2000).

■ Finally, defendant argues that his consecutive sentences for murder and attempted murder are unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the United States Supreme Court held that any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged, submitted to a jury, and proven beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476, 147 L. Ed. 2d at 446, 120 S. Ct. 2355. *Apprendi* applies where a legislature removes from a jury the assessment of facts that increase the "prescribed range of penalties to which a criminal defendant is exposed." *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363, quoting *Jones v. United States*, 526 U.S. 227, 252-53, 143 L. Ed. 2d 311, 332, 119 S. Ct. 1215, 1228-29 (Stevens, J., concurring). Our supreme court has held that sentences which run consecutively to each other are not transmuted

thereby into a single sentence (*People v. Wagener*, 196 Ill. 2d 269, 286 (2001)) and that consecutive sentences, taken together, do not constitute a "range of penalties" to which *Apprendi* applies (*People v. Carney*, 196 Ill. 2d 518, 534-35 (2001)). Therefore, no *Apprendi* violation occurred here.

For the foregoing reasons, we affirm defendant's convictions for murder, attempted murder, and aggravated battery with a firearm; we reverse defendant's convictions for possession of a controlled substance with intent to deliver; and we reduce defendant's sentence for the attempted murder of Officer Bubalo from 80 years in prison to 60 years in prison.

CAMPBELL, P.J., concurs.

JUSTICE REID, dissenting:

I dissent. I do not believe Blue received a fair trial because the trial court refused to place the defendant's self-defense claim before the jury. "A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence. If there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury." *People v. Santos*, 333 Ill. App. 3d 1, 7 (2002), citing *People v. Crane*, 145 Ill. 2d 520, 526 (1991).

The majority correctly recites the rule that "an instruction on self-defense must be given where the defendant presents some evidence of each of the following elements: (1) force had been threatened against the defendant; (2) defendant was not the aggressor; (3) the danger of harm to the defendant was imminent; (4) the force threatened to the defendant was unlawful; (5) the defendant actually believed that a danger existed, that force was necessary to avert the danger, and that the amount of force used by the defendant was necessary; and (6) all of defendant's beliefs were reasonable." 343 Ill. App. 3d at 935, citing *People v. Huddleston*, 243 Ill. App. 3d 1012, 1018 (1993). The majority also correctly explains the doctrine of transferred intent. The transferred intent doctrine teaches that a defendant can be convicted of attempted murder of an unintended victim if he shoots at one person with the intent to kill, but injures another; defendant's intent to kill the intended victim is transferred to the unintended victim. 343 Ill. App. 3d at 936, citing *People v. Conley*, 306 Ill. App. 3d 1, 7 (1999); *People v. Burrage*, 269 Ill. App. 3d 67, 76 (1994). In the context of self-defense, the *Conley* court explains that the doctrine of transferred intent also applies. *Conley*, 306 Ill. App. 3d at 7, citing *People v. Smith*, 94 Ill. App. 3d 969, 973-74 (1981).

" 'In deciding whether to instruct on a certain theory, the court's

role is to determine whether there is some evidence supporting that theory; it is not the court's role to weigh the evidence.' " *People v. Jones*, 175 Ill. 2d 126, 132 (1997), quoting *People v. Jones*, 276 Ill. App. 3d 1006, 1012 (1995) (Cook, P.J., dissenting); see also *People v. Lyda*, 190 Ill. App. 3d 540, 544 (1989). In assessing the merit of a claim of self-defense, "a defendant is entitled to the benefit of any defense shown by the *entire* evidence, even if the facts on which the defense is based are inconsistent with a defendant's own testimony." (Emphasis in original.) *Lyda*, 190 Ill. App. 3d at 544, citing *People v. Janik*, 127 Ill. 2d 390, 398 (1989). The defendant is similarly entitled to present his theory of innocence "even if the trial court believes that evidence offered in the support of that defense is inconsistent or of doubtful credibility." *Lyda*, 190 Ill. App. 3d at 545, citing *People v. Rodriguez*, 96 Ill. App. 3d 431, 436 (1981).

Bearing in mind that the quantum of evidence necessary to justify the granting of a particular jury instruction is quite small (*People v. Bratcher*, 63 Ill. 2d 534, 540 (1976)), Blue pointed to the testimony of Michael Campbell. According to Campbell, who heard gunshots, he described armed men shooting in the direction of his brother's building. While it is true that other witnesses disputed Campbell's story, claiming he told them nothing about the three men, it is for the trier of fact to weigh it. The jury should not only be free to hear the defendant's theory of innocence, it should be free to accept or reject it. The trial court's refusal to instruct the jury on self-defense and transferred intent denied Blue a fair trial. He should have been able to put his theory of transferred intent before the jury. As a result, this matter should be reversed and remanded for a new trial.